## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOSEPH E. MARSHALL, JR. (AKA WESLEY R. PITTMAN AND AKA JOHN JOHNSON),<br><br>*Defendant*. | Crim. Case No. 1:69-cr-1895 |

### MOTION FOR COMPASSIONATE RELEASE UNDER CORONAVIRUS SUPPORT CONGRESSIONAL REVIEW EMERGENCY AMENDMENT ACT OF 2020

As an inmate sentenced by this Court in the 1970s for only D.C. Code offenses, Defendant Joseph E. Marshall, Jr. moves this Court to grant him immediate release pursuant to the District of Columbia's Coronavirus Support Congressional Review Emergency Amendment Act of 2020. *See* D.C. Act 23-328 § 706(b) (June 8, 2020).  In support of his Motion, Mr. Marshall further relies upon the enclosed Memorandum of Points and Authorities.

Dated: September 4, 2020

Respectfully submitted,

Justin D. Kingsolver (DC & D.D.C. Bar No. 1033806)
**CROWELL & MORING LLP**
1001 Pennsylvania Ave. NW; Washington, D.C. 20004
Telephone: (202) 624-2500
JKingsolver@crowell.com

Dylan S. Burstein (CA Bar No. 307083)
**CROWELL & MORING LLP**
515 South Flower St.; Los Angeles, CA 90071
Telephone: (213) 310-7990
DBurstein@crowell.com

*Attorneys for Defendant Joseph E. Marshall, Jr.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Crim. Case No. 1:69-cr-1895[1] |
| JOSEPH E. MARSHALL, JR. (AKA WESLEY R. PITTMAN AND AKA JOHN JOHNSON), | |
| *Defendant.* | |

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION FOR COMPASSIONATE RELEASE UNDER D.C. CORONAVIRUS**
**SUPPORT CONGRESSIONAL REVIEW EMERGENCY AMENDMENT ACT OF 2020**

As an inmate sentenced by this Court in the 1970s for only D.C. Code offenses, Defendant Joseph E. Marshall, Jr. moves this Court for release pursuant to the District of Columbia's Coronavirus Support Congressional Review Emergency Amendment Act of 2020. *See* D.C. Act 23-328 § 706(b) (June 8, 2020).

## INTRODUCTION

Joseph Marshall is a 75-year-old man who has been incarcerated for nearly 50 years. He has been a model inmate throughout the near quarter century he has been in Bureau of Prisons ("BOP") custody. He does not have a single violent infraction, and has completed more than 30 programs and classes, including Victim Impact Counseling, Drug Relapse, Managing Conflict, and Anger Management. He has built and maintained a healthy relationship with his fiancée, who is prepared to welcome him into her home and support him once released.

---

[1] *See* Exhibit A for docket.

1

Joseph is a well-qualified candidate for release.  Indeed, a U.S. Parole Commission hearing examiner found just that when recommending Mr. Marshall for parole more than a decade ago.  However, the U.S. Parole Commission ("Commission") went *outside* the D.C. Parole Guidelines to overturn that decision, in violation of the *ex post facto* clause of the U.S. Constitution.  *See Daniel v. Fulwood*, 766 F.3d 57, 63-66 (D.C. Cir. 2014).

Mr. Marshall is currently incarcerated in Tucson, Arizona—the singular epicenter in the COVID-19 pandemic.[2]  Mr. Marshall's advanced age and medical diagnoses, particularly his heart and kidney conditions, increase his risk of developing serious COVID-19 complications— up to and including death.  And correctional facilities exacerbate the risk of COVID-19 infection. D. Ariz. G.O. 20-30 (June 24, 2020) ("COVID-19 cases have existed and do exist in the various prison facilities which house detainees that are involved in proceedings before this court.").  As such, Mr. Marshall's continued incarceration during the COVID-19 pandemic poses a serious risk to his safety.

Given his rehabilitation, age, medical conditions, and time served in prison, Mr. Marshall falls squarely in the category of elderly inmates eligible for compassionate release under Section 706(b) of D.C.'s Coronavirus Emergency Act.  COVID-19 is spreading like wildfire in prisons, and Mr. Marshall risks dying of COVID-19 in prison without compassionate release.  This Court should grant his release.

---

[2] Mike Stucka et al., *How the South and Southwest became the global epicenter of the COVID-19 pandemic*, USA Today (July 10, 2020), *available at* https://www.usatoday.com/in-depth/graphics/2020/07/10/maps-show-covid-19-hot-spot-surge-south/5397551002/ (last accessed July 21, 2020).

## **BACKGROUND**

Fifty years ago, Mr. Marshall committed serious crimes.  In 1971, this Court convicted Mr. Marshall for various D.C. Code offenses, including assault with intent to kill while armed, armed robbery, sodomy, carrying a dangerous weapon, and felony murder.  *See* Exhibit A, at 3. He was sentenced to serve a minimum of 35 years (which he has), and began his sentence on November 25, 1974.  *See id*.; Exhibit B, August 2018 Progress Report, at 1.  Thereafter, he was confined in a federal penitentiary in Illinois.  Exhibit C, Letter from Joseph Marshall, at 2.  For the first several years in custody, he faced serious anger issues.  *Id*.  But after spending much of the first decade of his imprisonment in solitary confinement, he "came face to face with [him]self and began to realize[] that [his] anger was self-induced."  *Id*.  "At that point [he] knew [he] had to change [his] life because [he] was on a path/collision to [his] own destruction."  *Id*.  Since that realization, Mr. Marshall has actively sought rehabilitation.  He has since completed more than 30 comprehensive BOP developmental programs and educational courses, earned his GED, and been an example to his fellow inmates.  *See* Exhibit B, Aug. 2018 Memorandum from Counselor VanKirk, at 1; August 2019 Progress Report, at 1-2.  In his decades in BOP custody, Mr. Marshall has incurred only three minor disciplinary infractions.  Exhibit B, Aug. 2019 Progress Report, at 2.  He has *never* been involved in *any* violent incidents while in BOP custody.  *Id*.

Considering both his original crimes and his model behavior for the better part of the last half-century, relevant D.C. Parole Guidelines indicate that parole should be granted for Mr. Marshall.  *See* 28 C.F.R. § 2.80(p)(1)-(2) (2016).  Despite that fact, the Commission denied Mr. Marshall parole, reasoning that Mr. Marshall had not completed the BOP's Residential Sexual Offender Treatment Program, *see* Exhibit D, Nov. 2018 Notice of Action, at 1 ("The Commission acknowledges that your institutional conduct has significantly improved and you

have continued to participate in programming.  The Commission, however, has conclude [sic] that Sex Offender Treatment is necessary to minimize the probability of your reoffending and the risk that you pose to the community")—a program that had never once been recommended to him in his previous 47 years of incarceration, *see* Exhibit D, Aug. 2016 Notice of Action, at 1. Determined to move forward, Mr. Marshall chose to transfer from his facility that did not offer the program to a higher security facility that did.  *See* Exhibit B, Aug. 2019 Progress Report, at 1; Exhibit I, Joseph Marshall Inmate Request.  He has now successfully enrolled in the program.

Now, Mr. Marshall is 75 years old, walker-bound, with number of underlying medical conditions.  *See* Exhibit E, Joseph Marshall Medical Records, at 1.  As a result of his transfer, he is housed at United States Penitentiary Tucson ("USP Tucson").  *See* Exhibit B, Aug. 2019 Progress Report, at 1.  As of July 17, 2020, there have been over 13,000 confirmed cases in Tucson's surrounding county, and over 135,000 statewide.[3]  COVID-19 has killed more than 2,500 people in Arizona.[4]  There are confirmed cases of COVID-19 in 99 BOP facilities, including the one in which Mr. Marshall is imprisoned, and the numbers in USP Tucson are bound to skyrocket like has happened in the community surrounding the prison.[5]  Mr. Marshall has committed very serious crimes, but continuing his incarceration will do nothing more than endanger his health.

---

[3] *Current Community Status—COVID-19*, City of Tucson (last updated July 17, 2020), *available at* https://www.tucsonaz.gov/covid-19/covid-19-updates (last accessed July 21, 2020).

[4] *Id.*

[5] *COVID-19 Cases*, Bureau of Prisons (last updated July 20, 2020), *available at* https://www.bop.gov/coronavirus/ (last accessed July 21, 2020).

## ARGUMENT

I. **THIS COURT HAS THE AUTHORITY TO RELEASE MR. MARSHALL UNDER THE NEWLY-ENACTED D.C. COMPASSIONATE RELEASE LAW.**

On May 19, 2020, the District of Columbia Council ("D.C. Council") voted unanimously to pass the Coronavirus Support Congressional Review Emergency Amendment Act of 2020 ("Coronavirus Emergency Act"), combining and extending previous emergency legislation passed to address concerns arising from the coronavirus pandemic sweeping the country.  *See* D.C. Act 23-328 § 706(b) (June 8, 2020).  Mayor Bowser signed the Act into law on June 8, 2020.  As a part of this legislation, the D.C. Council renewed its amendment to "An Act to establish a Board of Indeterminate Sentence and Parole for the District of Columbia and to determine its functions, and for other purposes, approved July 15, 1932, 47 Stat. 696; D.C. Code § 24-403 *et seq.*"  *Id.*  Specifically, the legislation outlines a compassionate release process for D.C. Code offenders, which allows inmates aged 60 and above who were convicted of felonies more than 20 years ago to request release from the sentencing court.  *See* D.C. Code § 24.403.04(a)(3)(B); *United States v. Hopson*, No. 2018 CF3 15480, 2020 D.C. Super. LEXIS 5, at *8-9 (May 22, 2020).

Mr. Marshall meets these criteria.  Councilmember Charles Allen, Chairman of Committee on the Judiciary and Public Safety, has explained that the purpose of D.C.'s compassionate release law is to provide an avenue for release for inmates just like Mr. Marshall: "[D.C.] residents incarcerated for D.C. Code offenses in BOP custody."[6]  Mr. Marshall is a

---

[6] D.C. Council, Twenty-Seventh Legislative Meeting, COVID-19 Response Supplemental Emergency Amendment Act of 2020, B23-0733 (Apr. 7, 2020), *available at* http://video.oct.dc.gov/VOD/DCC/2020_04/04_07_20_COW.html (Statement of Councilmember Allen) (explaining that D.C. emergency acts respond to the global pandemic, in part, by creating "a compassionate release program, modeled after our federal program, that (Continued...)

"D.C. Code offender" because he was convicted and sentenced in this Court solely for D.C. Code offenses—and not for federal offenses.  *See* Exhibit A at 3.  Mr. Marshall was convicted and sentenced in the early 1970s, when D.C. was still in the process of transitioning to its own trial court of general jurisdiction (the D.C. Superior Court system).[7]  He was then incarcerated at the federal penitentiary in Marion, Illinois.  *See* Exhibit A at 3.  And he has gone before the U.S. Parole Commission as a D.C. Code offender and inmate whose parole eligibility was considered under the D.C. Parole Guidelines.  Unsurprisingly given Councilmember Allen's statement, the new statute is specifically intended to apply to this population of D.C. Code offenders who, despite facing only non-federal offenses, were sentenced and convicted by this federal court. Specifically, new statute says that "*the court* may modify a term of imprisonment"—and it does not name the D.C. Superior Court unlike other similar provisions in the D.C. Code.  D.C. Code § 24.403.04(a) (emphasis added).  The District's new compassionate release provisions therefore apply to Mr. Marshall, and this Court should apply them.[8]

---

allows residents incarcerated for D.C. Code offenses in BOP custody to apply to Superior Court for relief if they fit in certain categories like senior inmates, or those near the end of life, and their release does not present any public safety danger") (last accessed July 21, 2020).

[7] *See* D.C. Courts, Superior Court, *available at* https://www.dccourts.gov/superior-court (last accessed July 21, 2020).

[8] If for some reason this Court determines that the federal compassionate release provisions apply to Mr. Marshall—a D.C. offender who was charged only under the D.C. Code, held in the D.C. prison, and evaluated under the D.C. parole guidelines—Mr. Marshall still qualifies for release under the First Step Act.  *See* 18 U.S.C. § 3582(c)(1)(A).  Although Mr. Marshall has not exhausted his administrative remedies as detailed in the statute, *see* 18 U.S.C. § 3582(c)(1)(A), this Court has held on several occasions that the "exhaustion requirement is *not* jurisdictional." *See United States v. Johnson*, No. 15-CR-125 (KBJ), 2020 WL 3041923, at *8 (D.D.C. May 16, 2020) (explaining that even if the Defendant did not exhaust his administrative remedies, that "failure . . . would be justifiable and entirely excused on futility grounds"); *see also id.* at *3 n.2 (collecting cases); *United States v. Morris*, No. CR 12-154 (BAH), 2020 WL 2735651, at *3 (D.D.C. May 24, 2020) ("The Courts of this District, however, have 'consistently concluded that section 3582(c)(1)(A)'s exhaustion requirement is not jurisdictional.'").
(Continued...)

The D.C. compassionate release provisions provide that:

Notwithstanding any other provision of law, the court may modify a term of imprisonment imposed upon a defendant if it determines the defendant is not a danger to the safety of any other person or the community, pursuant to the factors to be considered in 18 U.S.C. §§ 3142(g) and 3553(a) and evidence of the defendant's rehabilitation while incarcerated, and:

(1)     The defendant has a terminal illness, which means a disease or condition with an end-of-life trajectory;

(2)     The defendant is 60 years of age or older and has served at least 25 years in prison; or

(3)     Other extraordinary and compelling reasons warrant such a modification, including:

(A) A debilitating medical condition involving an incurable, progressive illness, or debilitating injuring from which the defendant will not recover;

---

Here, not only is exhaustion waivable given the urgent nature of the pandemic—*see*, *e.g.*, *United States v. Jennings*, No. 18-cr-17, ECF No. 30 at 3 (D.D.C. Apr. 22, 2020) (allowing waiver "given the history of the compassionate release statute and the urgency of the COVID-19 pandemic")—but exhaustion would also be futile.  In *United States v. Powell*, this Court deemed the federal compassionate release exhaustion requirement "futile because . . . [BOP] advised defense counsel . . . defendant [was] ineligible for home confinement."  No. 1:94-CR-00316 (ESH), 2020 WL 1698194, at *1 (D.D.C. Mar. 28, 2020).  The same has effectively happened here.  A federal regulation and BOP Program Statement both make clear that BOP "has no authority to initiate a request under 18 U.S.C. . . . 3582(c)(1)(A) on behalf of . . . D.C. Code offenders confined in federal institutions."  28 C.F.R. § 571.64; *BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)*, U.S. Dep't of Justice 15-16 (2019) (same); *see also Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F. 2d 90, 107 (D.C. Cir. 1986) (allowing exhaustion requirement to be waived where "the agency will almost certainly deny any relief either because it has a preconceived position on, or lacks jurisdiction over, the matter").

Mr. Marshall's circumstances warrant relief under the federal compassionate release provisions.  Mr. Marshall qualifies under the second category of eligible inmates, as he "(i) is at least 70 years old; and (ii) has served at least 30 years in prison." U.S.S.G. 1B1.13; *see also* 18 U.S.C. § 3582(c)(1)(A)(ii).  That said, Mr. Marshall also has extraordinary and compelling reasons warranting release: his heightened risk of contracting and dying from COVID-19.  *See infra* Section III.  Finally, as detailed fully below, Mr. Marshall "is not a danger to the safety of any other person or to the community." U.S.S.G. 1B1.13; *see infra* Section IV.  For these reasons, Mr. Marshall satisfies even the federal compassionate release requirements.

      **(B)   Elderly age, defined as a defendant who (i) Is 60 years of age or older; (ii) Has served at least 20 years in prison . . . . [and] (iii) Suffers from a chronic or serious medical condition related to the aging process or that causes an acute vulnerability to severe medical complications or death as a result of COVID-19.**

D.C. Code § 24.403.04(a) (emphasis added).  Motions for compassionate release pursuant to this statute can be brought by the defendant.  *Id.* at § 24.403.04(b).  No hearing is required.  *Id.* at § 24.403.04(c).

Because Mr. Marshall is 75 years old, has been incarcerated almost 50 years, is especially vulnerable to both contracting COVID-19 and experiencing serious COVID-19 complications because of chronic medical conditions, and is not a danger to any person or the community, he squarely falls within the third prong of eligible elderly inmates.  This Court, therefore, should grant him compassionate release.


## II.   MR. MARSHALL IS OLDER THAN 60 YEARS OF AGE AND HAS SERVED MORE THAN 20 YEARS IN PRISON.

In 1971, Mr. Marshall was convicted and sentenced to serve 35 years to life in prison.  *See* Exhibit A, at 3.  He has remained in prison ever since.  *See* Exhibit B, Aug. 2019 Progress Report, at 1.  Mr. Marshall has now served almost 15 years more than his minimum sentence.  *See id*.  Today, after nearly five decades in prison, Mr. Marshall is 75 years old.  *See id*.  He thus falls within the category of D.C. prisoners eligible for compassionate release.  *See* D.C. Code § 24.403.04(a)(3)(B) ("The defendant is 60 years of age or older and has served at least 20 years in prison . . .").

### III.   MR. MARSHALL IS VULNERABLE TO SEVERE MEDICAL COMPLICATIONS OR DEATH AS A RESULT OF COVID-19 BECAUSE OF HIS CHRONIC MEDICAL CONDITIONS.

Mr. Marshall warrants compassionate release because he faces a high risk for severe illness or death if he contracts COVID-19.  The Centers for Disease Control and Prevention ("CDC") has provided guidance about the categories of individuals who have the highest risk for severe complications from COVID-19.[9]  Among others, those categories include people "aged 65 and older" and people "who have serious heart conditions."  *Id.*

At 75 years old, Mr. Marshall is part of the 2.8 percent[10] of the federal prison population who is at especially high risk[11] of both contracting and dying from COVID-19.  In fact, the CDC reports that "8 out of 10 COVID-related deaths in the United States have been among adults 65 years and older."[12]  Mr. Marshall's underlying medical conditions, specifically hypertension, compound this risk.[13]  Exhibit E, Joseph Marshall Medical Records, at 1; *see United States v. Barber*, No. 14-239 (EGS), 2020 U.S. Dist. LEXIS 1114545, at *11 (June 16, 2020) (granting compassionating release under the First Step Act because, among other reasons, the defendant "has hypertension, which will increase his risk of hospitalization or death were he to contract

---

[9] *Coronavirus Disease 2019: People Who Are at Increased Risk for Severe Illness*, Centers for Disease Control and Prevention (last updated June 25, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last accessed July 21, 2020).

[10] Federal Bureau of Prisons, *Inmate Statistics: Inmate Age* (last updated July 11, 2020), *available at* https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (last accessed July 21, 2020).

[11] *Coronavirus Disease 2019: Older Adults*, Centers for Disease Control and Prevention (last updated June 25, 2020) ("In general, your risk of getting severely ill from COVID-19 increases as you get older."), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last accessed July 21, 2020).

[12] *Id*.

[13] *Id*.

COVID-19[.]")[14]; *United States v. Johnson*, No. 15-cr-125 (KBJ), 2020 U.S. Dist. LEXIS 86309, at *29 (May 16, 2020) ("The Centers for Disease Control and Prevention has specifically stated that hypertension is 'associated with increased illness severity and adverse outcomes' in COVID-19 patients.").  Mr. Marshall's medical problems go well beyond those the CDC has specifically identified.  He also suffers from an enlarged prostate, hyperthyroidism, and neuropathy in both legs.  Exhibit E, at 1-2.  The more underlying medical conditions a patient has, the more they are at risk of serious illness, and even death, from COVID-19.[15]  And recent data show that men are at a disproportionate risk of death and serious illness as a result of COVID-19.[16]  Considering the current global pandemic (which is uniquely severe in Tucson, Arizona where he is imprisoned) as well as Mr. Marshall's advanced age, sex, and underlying medical conditions, it is clear that his situation is dire.

---

[14] Because the D.C. compassionate release provisions were first enacted in April, there is minimal case law to guide this Court's decision.  As a result, this Court should consider federal cases interpreting and applying federal compassionate release.  In fact, in the first D.C. Superior Court case interpreting this new law, the court relied on "[federal] case law discussing a similar threshold for determining eligibility for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i)."  *See United States v. Gregory Williams-Bey*, No. 1982 FEL 002541, slip op. 7-8 (D.C. Super. Ct. Apr. 23, 2020); *see also Hopson*, 2020 D.C. Super. LEXIS 5, at *8-9 ("While there exists very little legislative history that provides guidance as to the definition of 'extraordinary and compelling reasons,' that which does exist indicates that the goal of the statute was to create an avenue for relief similar to that provided in the federal law").

[15] *Coronavirus Disease 2019: People with Multiple Underlying Conditions*, Centers for Disease Control and Prevention (last updated July 17, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last accessed July 21, 2020).

[16] *See* Derek M. Griffith et al., *Men and COVID-19: A Biopsychosocial Approach to Understanding Sex Differences in Mortality and Recommendations for Practice and Policy Interventions*, Centers for Disease Control and Prevention (July 16, 2020), *available at* https://www.cdc.gov/pcd/issues/2020/20_0247.htm (last accessed July 21, 2020).

Across the country, inmates are dying.  To stem this tide, courts are acting quickly to release susceptible inmates like Mr. Marshall.[17]  In fact, in granting a motion for compassionate release, the D.C. Superior Court acknowledged that courts across the country have granted many motions for federal compassionate release—after which D.C. compassionate release is modeled—due to COVID-19 concerns, and the court relied on federal case law to determine eligibility under the D.C. law.  *Hopson*, 2020 D.C. Super. LEXIS 5, at *8-9; *see, e.g.*, *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (concluding extraordinary and compelling reasons exist, where, among other things, Petitioner is 75 years old and "data recently released by the CDC indicates that approximately 80% of deaths from COVID-19 in the United States occur in individuals age 65 or older, and that the fatality rate for individuals aged 65 to 84 could be as high as 11 percent.").

As of July 19, 2020, the BOP has reported that three staff members have tested positive for COVID-19 at USP Tucson.[18]  USP Tucson's surrounding county has confirmed over 13,000 positive COVID-19 cases.[19]  Arizona Governor Doug Ducey paused the state's reopening, and Tucson's Mayor Regina Romero similarly declared an ongoing local emergency.[20]  The BOP asserts zero inmates have tested positive for the virus at USP

---

[17] *See, e.g.*, *Hopson*, 2020 D.C. Super. LEXIS 5, at *8-9 (granting compassionate release where defendant had hypertension, obesity, and other underlying medical conditions).

[18] *See COVID-19 Cases*, Bureau of Prisons (last updated July 19, 2020), *available at* https://www.bop.gov/coronavirus/ (last accessed July 21, 2020).

[19] *Current Community Status—COVID-19*, City of Tucson (last updated July 17, 2020), *available at* https://www.tucsonaz.gov/covid-19/current-community-status-covid-19 (last accessed July 21, 2020).

[20] Pausing of Arizona's Reopening Slowing the Spread of COVID-19, E.O. 2020-43 (Ariz. June 29, 2020), *available at* https://www.tucsonaz.gov/files/pdfs/Gov_Ducey_eo_2020-43.pdf; Proclamation of the Mayor Declaring a Continuing Emergency or Local Emergency Related to COVID-19, Declaration (Ariz. June 18, 2020), *available at* (Continued...)

Tucson.[21]  But that does not in fact mean that there are no positive cases.  Although the BOP has begun mass testing of inmates at several facilities hardest hit by COVID- 19, the results of increased testing at these facilities have only highlighted just how widespread the COVID-19 pandemic is within the federal prison system.[22]  Indeed, the testing results show two problems: first, that many of the BOP's numbers are artificially low; and second, that the disease has continued to spread at an alarming rate despite BOP's efforts to stop it.

Bipartisan coalitions of legislators have raised these same concerns.  In a letter sent to the Department of Justice ("DOJ") Inspector General by Senators Richard Durbin (D-IL) and Chuck Grassley (R-IA), who are the Senate Minority Whip and Senate Judiciary Committee Chairman, respectively, these legislators wrote:

> *We . . . worry that BOP is significantly underestimating the rate of COVID-19 infection in BOP facilities because BOP has not yet conducted the number of tests on staff or inmates appropriate for facilities where a highly contagious virus can be easily spread.*[23]

Even with increased testing, the BOP, like most communities, has a shortage of testing supplies and has had to rank which facilities have the greatest testing need.  With these limits on testing supplies, most facilities test only those inmates who show symptoms.  And to date,

---

https://www.tucsonaz.gov/files/pdfs/FINAL_Proc_6.18.20_-_Signed.pdf (last accessed July 21, 2020).

[21] *See id.*

[22] BOP Press Release, *BOP Expands COVID-19 Testing*, (Apr. 24, 2020), *available at* https://www.bop.gov/resources/news/20200424_expanded_testing.jsp (last accessed July 21, 2020). *See also* video message by Michael Carvajal, BOP Director (Apr. 29, 2020), *available at* https://www.bop.gov/resources/news/20200429_dir_message.jsp (last accessed July 21, 2020).

[23] Letter from Senator Richard Durbin and Senator Chuck Grassley to Michael Horowitz, DOJ Inspector General (Apr. 21, 2020), *available at* https://www.durbin.senate.gov/imo/media/doc/DOJ%20IG%20COVID-19%20BOP%20letter%20final%20signed.pdf (emphasis added) (last accessed July 21, 2020).

BOP has tested less than 25 percent of its total inmate population for COVID-19.[24]   As multiple recent studies have shown, however, many people who test positive for COVID-19 are asymptomatic carriers.[25]   Because the BOP cannot test everyone, these asymptomatic inmates continue to spread the disease throughout facilities.   While these asymptomatic inmates may never get sick themselves, they can spread the disease to someone like Mr. Marshall, who—because of his age, sex, and medical history—is more likely to suffer dangerous complications if he becomes infected.

Now that the virus has reached USP Tucson, its spread across the inmate population is inevitable.   Federal courts across the country have recognized this reality when granting motions for release.   That is why many courts have granted motions for compassionate release before there were *any* reported cases in the inmate's facility.   For example, when "[t]he United States argue[d] that release [was] improper . . . because it was unaware of any known COVID-19 cases at" the inmate's facility, the Eastern District of Michigan concluded that "argument fail[ed] to address the facts of the current global public health crisis—particularly as Michigan prisons are beginning to see exponential spread of the disease."   *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *5 (E.D. Mich. Mar. 27, 2020), *recons. denied*, No. 18-20315, 2020 WL 1547878 (E.D. Mich. Apr. 1, 2020).   The court went on to explain that "[t]he seemingly preemptive nature of Defendant's release renders it no less necessary or compelling."   *Id.*   Just the opposite—"waiting for either Defendant to have a confirmed case of COVID-19,

---

[24] *See id* (stating 31, 947 tests have been completed out of a population of 129, 224 federal inmates in BOP-managed institutions).

[25] *Coronavirus Disease 2019: How to Protect Yourself and Others*, Centers for Disease Control and Prevention (last updated Apr. 24, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed July 21, 2020).

or for there to be a major outbreak in Defendant's facility, would render meaningless this request for release." *Id.* at *3. "Such a failure to act," the court emphasized, "could have devastating consequences for Defendant and would create serious medical and security challenges to the existing prison population and the wider community." *Id.*; *see also, e.g.*, *United States v. Fellela,* No. 3:19-CR-79 (JAM), 2020 WL 1457877, at *1 (D. Conn. Mar. 20, 2020) ("Although I understand that no one has yet tested positive for the virus at Wyatt and I credit the Government's representations about the precaution being taken by Wyatt personnel, this does not change the fact that [Defendant] continues to be subject to close quarters confinement at Wyatt.").

More specifically, just days ago, another federal court granted compassionate release to **_an inmate at USP Tucson_** because "[a]lthough there are no known cases among the inmates [at USP Tucson], the Court finds the presence of COVID-19 among the staff and throughout the BOP generally presents a significant risk to defendant given his vulnerabilities." *United States v. Green*, No. 06-CR-53-CJW-MAR, 2020 U.S. Dist. LEXIS 121622, at *10 (N.D. Iowa July 10, 2020).

As the virus spreads in USP Tucson, Mr. Marshall will be left with little to no protection. The CDC recommends high-risk persons, like Mr. Marshall, take precautions to decrease their risk of becoming severely ill from COVID-19, such as social distancing and disinfecting high contact areas.[26] By the CDC's own admission,[27] however, these precautions

---

[26] *Coronavirus Disease 2019: People Who Are at Increased Risk for Severe Illness*, Centers for Disease Control and Prevention (last updated June 25, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html (last accessed July 21, 2020).

[27] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention (last updated (Continued...)

are often impossible in correctional facilities, particularly in an overcrowded facility like USP

Tucson.  *See* U.S. v. Martin, No. 19-cr-140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17,

2020) ("With no known effective treatment, and vaccines months (or more) away, public

health officials have been left to urge the public to practice 'social distancing,' frequent (and

thorough) hand washing, and avoidance of close contact with others (in increasingly more

restrictive terms)—all of which are extremely difficult to implement in a detention facility.").

This further increases the risk COVID-19 poses to inmates like Mr. Marshall.  *See United*

*States v. Johnson*, No. 15-cr-125 (KBJ), 2020 U.S. Dist. LEXIS 86309, at *29 (D.D.C. May

16, 2020) ("[I]t is clear beyond cavil that the present global health crisis is like no other in

modern times, and this Court fully acknowledges the unprecedented magnitude of COVID-19

pandemic and the extremely serious health risks that it presents for *all* of us, including, and

perhaps especially, those individuals who are unfortunately presently detained in federal

custody." (internal quotation marks omitted)).  This Court, moreover, has previously granted

compassionate release under the First Step Act in part since the defendant's underlying

medical conditions, including hypertension, "substantially diminish[ed] his ability to provide

self-care . . . because he is unable to protect himself from contact with inmates who have

COVID-19."  *United States v. Barber*, No. 14-239 (EGS), 2020 U.S. Dist. LEXIS 1114545, at

*12 (D.D.C. June 16, 2020).

     This is especially true in USP Tucson, which is experiencing severe overcrowding.

While an inspection report notes that the facility's capacity is 960 inmates,[28] the prison's own

---

July 14, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last accessed July 21, 2020).

[28] *USP Tucson Inspection Report*, District of Columbia Corrections Information Council (Apr. 4, 2017), *available at*
(Continued...)

webpage notes that there are 1,424 inmates at USP Tucson.[29]  This means USP Tucson has 400 inmates—almost 50 percent—over capacity.  *See*, *e.g.*, *United States v. Nkanga*, No. 18-CR-713 (JMF), 2020 WL 1529535, at *1 (S.D.N.Y. Mar. 31, 2020) ("Realistically, the best—perhaps the only—way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible.").

Now that COVID-19 has been detected within the facility, Mr. Marshall's future is grim.  Given the reality of prison conditions, Mr. Marshall will likely contract the virus.  And given his age, sex, and medical history, he faces a severe risk of death when he does.

## IV.   MR. MARSHALL HAS BEEN A MODEL INMATE WHO WILL NOT BE A DANGER TO THE COMMUNITY UPON RELEASE.

Mr. Marshall also meets the other requirement for compassionate release: he "is not a danger to the safety of any other person or the community[.]"  D.C. Code § 24.403.04(a).  Specifically, at 75 years old, Mr. Marshall is statistically unlikely to reoffend—and this is especially true due to his limited mobility.  *See generally* Exhibit E, Joseph Marshall Medical Records.  And his behavior in prison confirms that low risk: he has received only 3 infractions (none violent) since he began his sentence almost 50 years ago; he has found faith; he has worked hard to complete hundreds of hours of programming; his family is ready and willing to support him upon release; and his BOP counselor explicitly found that Mr. Marshall is not a disciplinary problem and is an example to his fellow inmates.  Put simply, Mr. Marshall will not be a danger to any person or community.

---

https://cic.dc.gov/sites/default/files/dc/sites/cic/publication/attachments/CIC%204.4.17%20Report%20on%20USP%20Tucson%20and%20BOP%20Response.pdf (last accessed July 21, 2020).

[29] *USP Tucson*, Bureau of Prisons, *available at* https://www.bop.gov/locations/institutions/tcp/ (last accessed July 20, 2020).

### A. Statistics Show that Inmates of Mr. Marshall's Age Are Unlikely to Reoffend.

Statistically speaking, Mr. Marshall's age of 75 alone foreshadows that he is unlikely to reoffend upon his release into the community.  Older releasees, in general, are "substantially less likely to reoffend likely than younger offenders to recidivate following release."[30]  More specifically, "[p]aroled lifers have very low recidivism rates, like other older people released from prison after serving long sentences even for serious or violent offenses."[31]  "[M]aturity and other processes they pass through during imprisonment convert lifers into non-violent and non-criminal individuals."[32]  The facts show that the same is true for Mr. Marshall: given his rehabilitation in prison and network of support, Mr. Marshall will be a productive member of society upon his release.

### B. Mr. Marshall Has Had No Violent Disciplinary Infractions While in BOP Custody and Few Infractions Overall.

Mr. Marshall has been a model inmate, incurring few disciplinary infractions.  In fact, Mr. Marshall's records show that he has received only three infractions since 1974—a true feat in the heavily policed environment of a federal prison.  *See* Exhibit B, Aug. 2019 Progress Report, at 2.  Only one of those infractions occurred within the last ten years, and concerned a misunderstanding about Mr. Marshall's medications after he transferred to USP Tucson (and

---

[30] Kim Steven Hunt & Billy Easley II, The Effects of Aging on Recidivism Among Federal Offenders, U.S. Sent'g Comm'n (2017), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last accessed July 21, 2020).

[31] Nazgol Ghandnoosh, *Delaying a Second Chance: The Declining Prospects for Parole on Life Sentences*, THE SENTENCING PROJECT (Jan. 31, 2017)*, available at* https://www.sentencingproject.org/publications/delaying-second-chance-declining-prospects-parole-life-sentences/#IV.%20Characteristics%20of%20Life-Sentenced%20Individuals (last accessed July 21, 2020).

[32] JOHN IRWIN, LIFERS: SEEKING REDEMPTION IN PRISON 6 (2009).

the charge was dismissed). *See id.* None of Mr. Marshall's BOP infractions were violent in nature. *See id.* Indeed, his BOP counselor observed that Mr. Marshall is "has *not* been a disciplinary problem[.]" Exhibit B, Aug. 2018 Memorandum from Counselor VanKirk, at 1.

### C. Mr. Marshall Has Completed Extensive Victim Impact, Substance Abuse, and Life Skills Programming, Lowering His Risk of Recidivism.

Mr. Marshall has taken every opportunity to better himself during his incarceration. He has completed courses in, *inter alia*, victim impact counseling, anger management, life skills, drug abuse and relapse, and stress management. *See generally* Exhibit F, Certificates of Completed Programming. In total, he has completed over 30 BOP programs. *Id.*; Exhibit B, Aug. 2019 Progress Report, at 1-2. More recently, he enrolled in the Challenge Program, which specialized treatment and counseling for offenders with histories of criminality, drug abuse, and mental illness. *See* Exhibit G, Challenge Program Information, at 1. This substantial programming not only demonstrates that Mr. Marshall took—and continues to take—responsibility for his actions and saw a need to change, but it also substantially reduces his likelihood of reoffending.

In addition, Mr. Marshall has made concerted efforts to ready himself to contribute to society. While incarcerated, Mr. Marshall earned his GED and completed multiple educational courses. *See* Exhibit B; *see generally* Exhibit F. He participated in vocational programs, including substantial programming in computer-aided design. He has participated the Bounce Back Reentry Unit, which immersed him in preparing for the realities of release and reentry, including basic finances, reducing the risks of reoffending, and applying for government benefits. *See* Exhibit B, Aug. 2018 Memorandum from Counselor VanKirk, at 1. He has worked as a housing unit orderly for years, earning the trust necessary to manage other orderlies. *See* Exhibit B, Progress Reports. As his counselor stated, Mr. Marshall "has

consistently attempted to prepare himself for potential release by completing any and all reentry related classes and programs."   Exhibit B, Aug. 2019 Progress Report, at 3.   His counselor also described him as someone who "volunteers when needed or asked and is an example to his fellow inmates."   Exhibit B, Aug. 2018 Memorandum from Counselor VanKirk, at 1.

The combination of Mr. Marshall's programming and work assignments have left him well prepared to re-enter the community as a productive citizen.   And he is more than willing to continue his substance abuse prevention programming and counseling via aftercare programs upon release.

### D. Mr. Marshall Has Maintained a Close Relationship for more than 40 Years, and Has a Safe, Supportive Place to Live upon Release.

In addition to the skills he has gained, Mr. Marshall also has the support of his fiancée to help him transition to life outside prison.   For more than 42 years, Mr. Marshall has maintained a close relationship with Ms. Patricia Vasicek.   Exhibit H, Letter from Patricia Vasicek, at 1. Ms. Vasicek describes their relationship as "respectful, honest, and forthcoming," and notes that she and Mr. Marshall "have the ability to express [them]selves well with one another."   *Id*.   She is dedicated to being "supportive of [Mr. Marshall] in his growth against recidivism."   *Id*.

Ms. Vasicek will provide Mr. Marshall with reliable transportation, shelter, and food. *Id*.   She owns a home at 615 Park Street in Prentice, Wisconsin—a "peaceful, rural community in north-central Wisconsin."   *Id*.   Price County, Wisconsin, where Ms. Vasicek lives, has documented only fourteen positive COVID-19 cases and less than ten COVID-related hospitalizations, which represents one of the lowest infection rates in the United States.[33] Given Mr. Marshall's age, sex, and medical conditions, residing in Price County would pose

---

[33] *Public Health COVID-19 Update*, Price County Health & Human Services (last updated July 21, 2020), *available at* https://co.price.wi.us/203/Public-Health (last accessed July 21, 2020).

significantly less risk to his health during the pandemic than the environment in which he is currently incarcerated.

### E.  Mr. Marshall Recognizes that He Committed Serious Crimes, And Deeply Regrets the Decisions He Made.

The crimes Mr. Marshall committed in the early 1970s were very serious.  Mr. Marshall admits his youth consisted of "a life of crime," and he lived "without any moral values or principles."  Exhibit C, Letter from Joseph Marshall, at 1.  He was heavily addicted to alcohol and drugs.  But he makes no excuses for his serious crimes.  Instead, he "take[s] full responsibility for [his] crimes," and is "completely remorseful for the harm and hurt that [he] ha[s] caused."  *Id*. at 1-2.  Others describe that Mr. Marshall has "always accepted . . . responsibility for his confinement."  Exhibit H, at 1.  Soon after he began serving his sentence, realized he was on a pathway "to his own destruction," and began to take accountability for his actions."  Exhibit C, at 1.

Over the next several decades, he undertook a determined course of self-improvement, achieving his GED and dozens of certificates of achievement in victim impact, substance abuse, and life skills programming.  In those many years, he has had no serious behavioral incidents. Instead, he found faith and began mentoring younger inmates.  As Ms. Vasicek describes: "I can honestly say that I have seen a lot of positive growth in [Mr. Marshall] during the many years we've known one another."   Exhibit H, at 1.  In his own words, Mr. Marshall is "no longer the hard hearted person that [he] was in [his] youth. [He] is a man now and [he] want[s] to use the remaining years of [his] life helping humanity in any way that [he] can."  Exhibit C, at 3.

Mr. Marshall has served almost 15 years more than his minimum sentence, and more than double the years that required to qualify for compassionate release under D.C.'s newly-

enacted statute. Mr. Marshall's model behavior over the last quarter century should allay any concerns about recidivism. And Mr. Marshall is more than willing to continue counseling outside of prison post-release to further reduce that risk.

### F.  According to the Applicable Parole Guidelines, Mr. Marshall Has a Low Risk of Reoffending.

Because he committed offenses in the District of Columbia prior to March 3, 1985, parole determinations for Mr. Marshall must be based on the former D.C. Board of Parole's 1972 guidelines ("1972 Guidelines"), which were in effect at the time he offended. *See* 28 C.F.R. § 2.80(p)(1)-(2) (2016) (defining substantive eligibility standard in Section 105.1 of the 1972 Guidelines applies to pre-1985 offenses); *see also Daniel v. Smoot*, 316 F. Supp. 3d 79, 85 (D.D.C. 2018) (finding the 1972 D.C. parole guidelines applicable to D.C. Code offenders with offenses predating 1985). The 1972 Guidelines involve no rigid calculations of "guidelines ranges," but instead, the proper focus under these guidelines must be on Mr. Marshall's prospective risk to society—a risk he no longer poses. 28 C.F.R. § 2.80(p)(1)-(2) (2016).

The 1972 D.C. Parole Guidelines authorize parole "[w]henever it shall appear to the [Commission] that there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his release is not incompatible with the welfare of society, and that he has served the minimum sentence imposed or the prescribed portion of his sentence." *See* D.C. Code § 24-204(a); *see also* D.C. Board of Parole Guidelines (July 24, 1972) at §§ 105; 105.1 (detailing additional factors proper for consideration, including Mr. Marshall's ability to handle interpersonal relationships; Mr. Marshall's education and training while in prison; and the community resources available to assist Joseph's reintegration). For at least five reasons, Mr. Marshall exceeds these standards, militating in favor of compassionate release.

First, there is a high probability that Mr. Marshall will live and remain at liberty without violating the law.  As detailed above, Joseph is a 75-year-old man with limited mobility.  He has hypertension, thyroid and prostate issues, and neuropathy in both legs, and he tires easily.  *See* Exhibit E, Joseph Marshall Medical Records, at 1.  Mr. Marshall's physical condition and advanced age make it exceedingly unlikely that he would have the physical capacity to re-offend if released.  And Mr. Marshall is not the same man he was in 1969.  As he explains in his attached letter, he has spent decades addressing and overcoming the anger that motivated his crimes, and has become a man dedicated to his faith.  Exhibit C, Letter from Mr. Marshall, 1-3.

Second, Mr. Marshall has an exemplary institutional record.  Joseph has been a model prisoner for decades, with no significant disciplinary issues in the last 30 years.  One of Mr. Marshall's unit counselors has called Joseph "an example to his fellow inmates."  Exhibit B, Aug. 2018 Memorandum from Counselor VanKirk, at 1.

Third, Mr. Marshall's release is entirely compatible with the welfare of society.  Mr. Marshall has diligently prepared himself for life as a law-abiding citizen.  Mr. Marshall obtained his GED early in his incarceration, and he has participated in decades of significant educational, developmental, and work skills programming, including extensive substance abuse and victim impact training.  *See* Exhibit F, Certificates of Completed Programming.  Mr. Marshall recently completed the Bounce Back Reentry Program, which immersed him in preparing for the realities of release and reentry, including basic finances, reducing the risks of reoffending, and applying for government benefits.  *See id.*  In the last year, he has completed additional programming on alcohol and substance abuse and enrolled in a sex offender treatment program, as the U.S. Parole Commission's hearing examiner encouraged during his fall 2019 parole hearing.  *See* Exhibit F, Drug Abuse Education Course Certificate, at 2; *see*

*generally* Exhibits I; J. He even sought a transfer to a higher security facility, USP Tucson, specifically for the purposes of enrolling in the sex offender treatment program. *See* Exhibit B, Aug. 2019 Progress Report, at 1. Importantly, further incarceration will not help prepare Mr. Marshall for release because, our client has advised us, ***all inmate programming has been suspended indefinitely at USP Tucson due to recent COVID-19 lockdowns***.[34]

Fourth, Mr. Marshall's strong ties will also help him succeed post-release. Even through decades of incarceration, he still enjoys a close relationship with his fiancée of over forty years, Ms. Patricia Vasicek, with whom he speaks almost daily. *See* Exhibits C and H. As explained above, Mr. Marshall will live in Ms. Vasicek's home in Prentice, Wisconsin upon his release. *See* Exhibit H, at 2. She explains that she "can honestly say that [she] has seen a lot of positive growth in him during the many years [they]'ve known one another." *Id*. She confirms that Mr. Marshall "has the intention to remain committed to positivity and staying tobacco, alcohol, and drug free" and that she "intend[s] to be supportive of him in his growth against recidivism." *Id*. Ms. Vasicek has committed to providing Mr. Marshall with reliable food, shelter, and transportation. *Id*. With the significant support he will receive upon release, Mr. Marshall will have an extra layer of accountability in place to avoid re-offending. Importantly, Mr. Marshall faces a very low risk of COVID infection in Prentice, Wisconsin. With only fourteen confirmed infections, Price County (in which Prentice is located) has one of

---

[34] Case law further supports that Mr. Marshall should not be faulted for not yet completing this program. *See, e.g.*, *United States v. Yellin*, No. 3:15-cr-3181-BTM-1, 2020 U.S. Dist. LEXIS 112786, at *9-11 (S.D. Cal. June 26, 2020) (granting compassionate release despite the fact the defendant had not yet completed BOP's sex offender treatment program, in part because such treatment is available outside of prison under parole supervision); *United States v. Dillard*, No. 1:15-CR-00170-SAB, 2020 U.S. Dist. LEXIS 90865, at *6-7 (D. Idaho Apr. 27, 2020) (same).

the lowest rates of COVID infection in the United States.[35]

Fifth, Mr. Marshall has already served his minimum sentence, plus an *additional decade* behind bars.  Mr. Marshall committed his offenses more than 50 years ago on July 10, 1969. Exhibit A, Docket, at 1.  Mr. Marshall began serving his sentence—to spend at least 35 years in prison, whereupon he would have the opportunity to seek parole—nearly 46 years ago on November 25, 1974.  *Id*. at 3.

## **CONCLUSION**

Mr. Marshall falls squarely within the category of elderly inmates eligible for compassionate release under the D.C.'s Coronavirus Support Congressional Review Emergency Amendment Act of 2020: (1) he is 75 years old; (2) has served more than 45 years of imprisonment; (3) is vulnerable to COVID-related illness and death because of his underlying medical conditions; and (4) is not a danger to the community, as evidenced by his rehabilitation and family support.  *See* D.C. Code § 24.403.04(a).

For these reasons, this Court should grant Joseph Marshall's motion for compassionate release and enter the Proposed Order attached hereto.

---

[35] *Public Health COVID-19 Update*, Price County Health & Human Services (last updated July 21, 2020), *available at* https://co.price.wi.us/203/Public-Health (last accessed July 21, 2020).

Dated: July 24, 2020                    Respectfully submitted,

 

 

Justin D. Kingsolver (DC & D.D.C. Bar No. 1033806)
**CROWELL & MORING LLP**
1001 Pennsylvania Ave. NW
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
JKingsolver@crowell.com

Dylan S. Burstein (CA Bar No. 307083)
**CROWELL & MORING LLP**
515 South Flower St.
Los Angeles, CA 90071
Telephone: (213) 310-7990
Facsimile: (213) 622-2690
DBurstein@crowell.com

*Attorneys for Petitioner Joseph E. Marshall, Jr.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA <br><br> v. <br><br> JOSEPH E. MARSHALL, JR. (AKA WESLEY R. PITTMAN AND AKA JOHN JOHNSON), <br><br> *Defendant*. | Crim. Case No. 1:69-cr-1895 |

**[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE UNDER D.C. CORONAVIRUS SUPPORT CONGRESSIONAL REVIEW EMERGENCY AMENDMENT ACT OF 2020**

Pending before the Court is Defendant Joseph E. Marshall, Jr.'s ("Mr. Marshall") Motion for Release pursuant to the District of Columbia's Coronavirus Support Congressional Review Emergency Amendment Act of 2020 ("Motion"). *See* D.C. Act 23-328 § 706(b) (June 8, 2020). Upon consideration of the Motion, the Memorandum of Points and Authorities in support, the applicable local rules, and District of Columbia precedent, it is hereby:

**ORDERED** that, good cause having been shown in light of the coronavirus pandemic and Mr. Marshall's age, incarceration record, and underlying health conditions, the Motion for Compassionate Release is hereby GRANTED; and it is

**FURTHER ORDERED** that Mr. Marshall be IMMEDIATELY RELEASED from the United States Penitentiary in Tucson, Arizona and not be placed into any quarantine at that or any other Bureau of Prisons facility.

**SO ORDERED.**

Date:

_____
The Honorable [ _____ ]
United States District Judge