# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:69-cr-01895 (APM)** |
| | : | |
| **JOSEPH E. MARSHALL JR.,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S
## MOTION TO REDUCE SENTENCE PURSUANT TO D.C. ACT 23-328 § 706(b)

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this Opposition to defendant's Motion for Compassionate Release (ECF No. 3). Defendant, who has served 45 years of his 35 years to life sentence in this case for Assault with Intent to Kill While Armed, Armed Robbery, Sodomy, Carrying a Dangerous Weapon, and First Degree Murder, seeks reduction of his sentence to time served. His request is pursuant to D.C. Act 23-328 § 706(b) which amended D.C. Code § 24-403.04. Defendant's request is based upon having "been incarcerated for nearly 50 years," and because his age and "underlying medical conditions, specifically hypertension" compound the risk of both contracting and dying from COVID-10. (ECF No. 3 at 1). The government acknowledges that the defendant has established an extraordinary and compelling reason under D.C. Code § 24-403.04(a)(2). At issue is whether he is a danger to the safety of any other person or the community, and if he is sufficiently rehabilitated to warrant early release from his life sentence. The government remains concerned about his rehabilitation and the need for the sentence imposed to reflect the seriousness of the offense. Therefore, the government opposes defendant's motion.

## BACKGROUND AND RELEVANT PROCEDURAL HISTORY

On March 23, 1968, defendant attacked, robbed, raped, and committed sodomy against Margie Harrison, after saying they would help the victim's husband, David Harrison, home as he was lost and had asked defendant and another man who was with defendant for directions. (Exhibit A – Clinical Records at 19; Exhibit B – PSR at 3). When they arrived at the home, the other man stayed in the car while defendant followed the husband into his apartment. Defendant then fondled Mrs. Harrison while she was asleep in her bed. (Exhibit A at 19). Both Mrs. Harrison and her husband yelled at defendant to get him to stop, and then defendant pulled out a knife, and hit the husband twice in the head, which resulted in injury. (*Id.;* Exhibit B at 3). Defendant verbally threatened to kill the Harrisons and their children during the commission of the offense; additionally, he pulled the phone from the wall. (Exhibit A at 19). Sexual contact included defendant telling Mrs. Harrison to remove her clothes, cutting her on the forehead when she did not remove her clothes quickly enough, penis-to-mouth sexual contact, and rape. (Exhibit A at 19; Exhibit B at 3). Following the sexual assault, defendant made Mrs. Harrison give him all of the money she had, which was about $65.00, then cut her forearm. (Exhibit A at 19; Exhibit B at 4). In a second incident around the same time period, defendant shot a woman and a man, killing the woman.[1]

On March 19, 1971, a jury found defendant guilty of Assault with Intent to Kill While Armed, Armed Robbery, Sodomy, Carrying a Dangerous Weapon, and First Degree Murder. On June 10, 1971, defendant was sentenced to 10 to 30 years for Assault with Intent to Kill While Armed, 15 years to life for Armed Robbery, 3 to 10 years for sodomy, 1 year for Carrying a

---

[1] Due to the age of the case and the closure of the records center, the case file and prior PSR are not readily accessible. The offense summary for the second incident is found in the U.S. Parole Commission's Notice of Action dated November 26, 2018, which is Defense Exhibit D (ECF 3-4 p. 2).

Dangerous Weapon, the sentences to be served concurrently but after the termination of an 8-year Robbery sentence being served in New York. For the count of First Degree Murder, defendant was sentenced to 20 years to life, with the sentence to commence after termination of the sentences for the other charges. The docket reflects, "This man is a public menace to life and safety and it is the firm recommendation of the Court that the Parole Board should NEVER release him into society under any circumstances." (ECF 3-1 at 4).

Defendant appealed and his convictions were affirmed on November 9, 1973. (*Id*.). On February 28, 1974, defendant filed a motion for a new trial based on newly discovered evidence, which was denied on March 25, 1974. (*Id.* at 5). Defendant appealed the denial on April 2, 1974 and the decision was affirmed on March 10, 1975. (*Id.* at 5, 7). On June 2, 1975, defendant filed a *pro se* motion for reduction of sentence, which was denied on June 4, 1975. (*Id.* at 7).

On September 4, 2020, defendant, through counsel, filed a motion for compassionate release pursuant to D.C. Act 23-328 § 706(b) (ECF No. 3). Defendant is currently serving his sentence at USP Tucson, in Tucson, AZ.

## BOP's RESPONSE TO THE PANDEMIC

In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by a modified operations plan that requires all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.

Official staff travel has been suspended, with the exception of relocation travel; staff training also has been suspended with the exception of basic training for new staff.

BOP has limited the movement of inmates and detainees among its facilities. This does not mean the BOP has ceased all inmate movements because the federal judicial system as well as state courts continue to process criminal cases. These movement exceptions may include, but are not limited to, transfers related to forensic studies, writs, Interstate Agreements on Detainers (IAD), medical or mental health treatment (including local medical trips), and RRC placements. BOP also needs to move inmates to better manage the detention bedspace as well as assure that administrative facilities do not become overcrowded beyond available resources. The BOP and the USMS are coordinating carefully to transport and transfer federal inmates into the Bureau's custody while taking proactive steps, including aggressive testing, to mitigate the transmission of COVID-19 into the federal prison environment.

All staff and inmates have been and will continue to be issued facemasks and are strongly encouraged to wear an appropriate face covering when in public areas and social distancing cannot be achieved. Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates with exposure risk factors are placed in isolation and test for COVID-19 per local health authority protocols. Enhanced health screening of staff is being performed at all BOP locations; this screening includes self-reporting and temperature checks.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy

Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13 to limit the number of people entering the facility and interacting with inmates. On September 30, 2020, the BOP announced that, as a modification of its Phase Nine Action Plan, and in accordance with specific guidance designed to mitigate risks, social visits are being reinstated as of October 3, 2020, where possible to maintain the safety of our staff, inmates, visitors, and communities. Each individual institution has made plans consistent with their institutional resources (including physical space) and will continuously monitor their visiting plan, and make prompt modifications, as necessary, to effectively manage COVID-19. *See* https://www.bop.gov/resources/news/20200902_visitation.jsp. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month.

Tours of facilities are suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. Confidential legal calls will be allowed in order to ensure access to counsel.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp; *see also* https://www.bop.gov/coronavirus/covid19_status.jsp.

In an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the BOP Director, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That

authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). In addition, under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred approximately 7,820 inmates to home confinement. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks and months ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. BOP thus must carry out its charge to incarcerate sentenced criminals to protect the public; consider the effect of a mass release on the safety and health of both the inmate population and the citizenry; marshal its resources to care for inmates in the most efficient and beneficial manner possible;  assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care; and consider myriad other factors,

6

including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the CSOSA has necessarily cut back on home visits and supervision).

**ARGUMENT**

I. **Defendant Does Not Qualify For Compassionate Release Under D.C. Code § 24-403.04**

   A. **Legal Principles**

The compassionate release provision, codified at D.C. Code § 24-403.04, states in part as follows:

> (a)  Notwithstanding any other provision of law, the court may modify a term of imprisonment if it determines the defendant is not a danger to the safety of any other person or the community, pursuant to the factors to be considered in 18 U.S.C. §§ 3142(g) and 3553(a) and evidence of the defendant's rehabilitation while incarcerated, and:
>
> (1)  The defendant has a terminal illness, which means a disease or condition with an end-of-life trajectory;
>
> (2)  The defendant is 60 years of age or older and has served at least 25 years in prison; or
>
> (3)  Other extraordinary and compelling reasons warrant a modification, including:
>
>   (A)  A debilitating medical condition involving an incurable, progressive illness, or a debilitating injury from which the defendant will not recover;
>
>   (B)  Elderly age, defined as a defendant who is:
>    (i)  60 years of age or older;
>    (ii)  Has served at least 20 years in prison or has served the greater of 10 years or 75% of their sentence; and
>    (iii)  Suffers from a chronic or serious medical condition related to the aging process or that causes an acute vulnerability to severe medical complications or death as a result of COVID-19;
>
>   (C)  Death or incapacitation of the family member caregiver of

7

the defendant's children; or

(D)     Incapacitation of a spouse or a domestic partner when the defendant would be the only available caretaker for the spouse or domestic partner.

As the movant, the defendant bears the burden to establish that he is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 898 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1355 (11th Cir. 2014). To merit relief, defendant thus must show an extraordinary and compelling reason within the meaning of the statute and, per the factors set forth in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3142(g), that he is not a danger and has been rehabilitated.

**B.   Extraordinary and Compelling Reason**

Defendant is over 60 years or age and has served at least 20 years in prison and therefore meets the criteria of D.C. Code § 24-403.04(a)(2). He also asserts his age of 76[2] and his hypertension as risk factors for serious COVID infection. His BOP medical records do reflect a diagnosis of hypertension, unspecified essential. (ECF 3-5). Defendant's medical care is classified as Care Level 2. (Exhibit C – Inmate Profile). Inmates with this designation are considered stable outpatients who require clinician evaluations monthly to every 6 months.[3]

The CDC's current guidance regarding age and COVID-19 states in part, "As you get older, your risk for severe illness from COVID-19 increases. For example, people in their 50s are at higher risk for severe illness than people in their 40s. Similarly, people in their 60s or 70s are, in

---

[2] His motion states his age as 75, but his BOP records indicate he is 76.

[3] All inmates in BOP custody are classified on a scale of Care Level 1 (healthiest) to Care Level 4 (requiring housing in a medical facility). *See* https://www.bop.gov/resources/pdfs/care_level _classification_guide.pdf

general, at higher risk for severe illness than people in their 50s. The greatest risk for severe illness from COVID-19 is among those aged 85 or older."[4]

The CDC's current guidance is that "[h]aving other cardiovascular or cerebrovascular disease, such as hypertension (high blood pressure) or stroke, **may** increase your risk of severe illness from COVID-19."[5]

In sum, the government agrees that under D.C. Code § 24-403.04(a)(2), defendant has established an extraordinary and compelling reason.

## C. <u>Defendant Has Not Shown that He Is No Longer Dangerous and that He Has Been Rehabilitated</u>

Defendant has not met his burden of showing that he has been sufficiently rehabilitated and is not a danger to the safety of any other person, because he has not completed the needed sex offender treatment and he does not have a viable, structured release plan. Additionally, the government has concerns that reducing the defendant's sentence would minimize the nature and seriousness of his crimes. *See e.g., United States v. Epstein*, 2020 WL 2537648 (D.N.J. May 19, 2020) (release denied to 74-year-old defendant suffering from numerous ailments, but receiving

---

[4] *See* Centers for Disease Control, *Older Adults, available at*: https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/olders-adults.html (last accessed October 13, 2020).

[5] *See* Centers for Disease Control, *Groups at Higher Risk for Severe Illness, available at*: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html, (last accessed October 13, 2020)(emphasis added); *see also United States v. Carter*, 2020 WL 4194014, at *2 (S.D. Ga. July 21, 2020) (hypertension is not sufficient; "at this point, the Court cannot conclude that the 'might' category qualifies an illness as sufficiently serious to warrant compassionate release in and of itself."); *United States v. Melgarejo*, 2020 WL 2395982, at *4 (C.D. Ill. May 12, 2020) ("The Court could find no cases where a defendant with hypertension and no comorbidities was granted relief under the compassionate release statute.") United States v. Durham, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020) (hypertension is not sufficient; "Given the lack of data and certainty regarding this second group of conditions, the fact that Defendant has a condition that may increase his risk for severe illness from COVID-19, without more, does not present an 'extraordinary and compelling reason' under the compassionate release statute and U.S.S.G. § 1B1.13.").

proper treatment, and his kidnapping offenses were "severe and violent"); *United States v. Bueno-Sierra*, 2020 WL 2526501, at *5 (S.D. Fla. May 17, 2020) (defendant is 72 years old and has diabetes and hypertension, but they are controlled and insufficient to justify compassionate release).

In assessing a request for compassionate release, the Court may shorten a sentence only if the Court "determines the defendant is not a danger to the safety of any other person or the community, pursuant to the factors to be considered in 18 U.S.C. §§ 3142(g) and 3553(a)" and that there is "evidence of the defendant's rehabilitation while incarcerated." D.C. Code § 24-403.04(a).

In assessing these points, the Court is to consider the factors set forth at 18 U.S.C. §§ 3142(g), -3553(a). The factors set forth at 18 U.S.C. § 3142(g) (a pretrial release statute) include the nature and circumstances of the offense, including whether the offense is a crime of violence; the weight of the evidence; defendant's history and characteristics, and "the nature and seriousness of the danger or the community that would be posed" if defendant were released. The factors that the Court must consider under § 3553(a) (which sets forth factors the Court must consider at sentencing) include "the nature and circumstances of the offense," "the history and characteristics of the defendant," and also the need for a sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrence to criminal conduct;" "to protect the public from further crimes of the defendant;" and "to provide the defendant with needed educational or vocational training, medical care, and other correctional treatment in the most effective manner."

As reflected above, there is some overlap between the factors that the Court must consider under these two federal statutes. We have focused our discussion below on the main areas of concern in the two statutes.

1. *Severity of the Defendant's Crimes and Strength of the Evidence*

Defendant's attack on the Harrisons in one incident, and the shooting of a woman and a man, which was fatal to the woman, in another, are very serious violent offenses. He was convicted of several heinous and violent crimes — Assault with Intent to Kill While Armed, Armed Robbery, Sodomy, Carrying a Dangerous Weapon, and First Degree Murder. The government's case against him was strong, as evidenced by the fact that his convictions were affirmed on direct appeal.

2. *History and Characteristics of the Defendant, including His Record at BOP*

Defendant's prior criminal history began at a young age and at age 17 he was sent to the National Training School. (Exhibit B at 4-5). Before being released at the age of 20, defendant had been cited for fighting and refusing to work, had escaped twice and committed larceny before being returned to the school. (*Id.* at 5). After his return, he sexually assaulted two young boys and was recommended for transfer to the Federal Reformatory at Petersburg Virginia, where he received seven additional conduct reports including another sexual assault. (*Id.*).

Not long after his release, in 1964, defendant was convicted for Grand Larceny and First Degree Murder. (*Id.* at 6). Responding law enforcement officers found the victim on his back at the foot of his bed unconscious which his pants pulled to his ankles bleeding from his rectum and face. Injuries to the victim included a cut from his ear to his mouth, a very deep cut in the face, and eyes were dark/swollen, and jaw appeared broken. (*Id.*). Defendant was sentenced to 20 months to 5 years and was released on parole in early 1968. (*Id.*). His BOP records indicate he "also has a history of violating conditions of parole," which resulted in an executed parole warrant in 1970. (Exhibit A at 20).

In 1969, defendant fired shots at police officers, was charged with attempted murder of a police officer, pled guilty to robbery, and was sentenced to 8 years' incarceration; however, defendant committed the offenses in this case before he was confined. (Exhibit B at 7).

According to defendant's current BOP inmate profile, defendant is classified as a "high" security level risk, but a "low" risk for recidivism. (Exhibit C). BOP scores inmates for recidivism risk as either "minimum," "low," "medium," or "high." His Static-99R score of 4 suggests he is in the Above Average range of risk relative to other adult male sex offenders." (Exhibit A at 20).

Additionally, in 1997, 2008, and 2018, defendant incurred Level 300 disciplinary infractions while in BOP custody. (Exhibit D – Inmate Discipline Data). BOP divides prohibited infractions into four categories, with Level 100 prohibited acts classified as the most serious ("Greatest Severity") and level 400 prohibited acts as the least serious.

While incarcerated at BOP, defendant took a 36-hour course in 1983, and then no other classes until 2001. (Exhibit E – Inmate Education Data). He obtained his GED in 1991. (*Id.*). Defendant took a 750-hour AutoCAD class in 2004, and other than those two classes, he has taken an average of 11.5 hours of programming per year between 2001 and the present, with a number of multi-year spans with no programming at all. (*Id.*).

Defendant's parole hearing on October 31, 2018 resulted in the denial of parole with the rehearing set for October 2019 and the comment that "Sex Offender Treatment is necessary to minimize the probability of [defendant] reoffending and the risk that [he] pose[s] to the community." (Defense Exhibit D (ECF 3-4 p. 2)). Defendant was oriented to USP Tucson's Sex Offender Management Program (SOMP), treatment was recommended, and he was placed on the Non-Residential SOTP waitlist. (Exhibit A at 22, 24, 26). Defendant's introduction to SOTP was completed on January 27, 2020 and on February 12, 2020 he had his motivational interview. (*Id.*

at 10, 16). The interview notes indicated defendant "stated he wanted to participate in SOTP due to recommendation from the parole board . . . would not have requested the program without the parole board's recommendation . . . did not see himself as a sex offender and hopes to learn what a sex offender is and wants to 'learn not to be a sex offender.'" (*Id.* at 10). With respect to the sodomy charge in this case, defendant "stated he committed the offense, but did not commit the offense with sexual intent. He stated the intent was to 'torture' the male victim using the female victim" but "did not have any desire to sexually abuse a person before." (*Id.*).[6] These statements suggest that defendant is in denial about the nature and gravity of his offenses, and that he fails to appreciate the harm he inflicted on his victims and, by extension, the community.

### 3.   *Need for the Sentence Imposed*

In deciding whether to release defendant, the Court must consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. 18 U.S.C. § 3553(a). Here, defendant took a life, and committed violent and sexual crimes that surely had lasting effects on the victims, and the families of the victims.[7] Defendant acknowledged he "believes [his female sexual assault victim] was 'traumatized' and he further described this as being 'shocked.' He stated it would take a while for her to return to normal, but then corrected himself saying she would 'never deal with as normal.'" (*Id.* at 10).

---

[6] Group sessions had to be canceled as of March 17, 2020 due to COVID-19 and defendant therefore has not been able to complete the treatment program. (*Id.* at 16).

[7] Due to the age of this case and the closure of the Federal Records Center, the government has not been able to locate the victims.

Hence, his crimes merit the sentence that this Court imposed. Reducing the defendant's sentence would minimize the nature and seriousness of the offenses, and would be an injustice to his victims. *See Epstein*, 2020 WL 2537648.

Furthermore, defendant's plan if released is to live in Prentice, Wisconsin with Ms. Vasicek, who he apparently met while incarcerated, and who will provide him with "reliable transportation, shelter, and food." (ECF No. 3 at 1, 19, 23). Defendant asserts he is "more than willing to continue his substance abuse prevention programming and counseling via aftercare programs upon release," but does not give any specifics on what is available in this rural Wisconsin town. (ECF No. 3 at 19, 21). Defendant claims "his family is ready and willing to support him upon release," (ECF No. 3 at 16-17, 24) but does not provide additional details. His BOP records reflect that his parents have passed away and his children are 39 and 42 and that he "has a fair relationship with them and interacts with them infrequently though phone calls." (Exhibit A at 2).

The Court should be concerned that defendant lacks a detailed plan for what he would do, how he would support himself, how he would continue his rehabilitation, and how he would attend to his medical needs if he were to be released early. (*See e.g., United States v. Allison*, 2020 WL 3077150, at *4 (W.D. Wash. June 10, 2020) ("An appropriate release plan is essential to ensure that a defendant actually has a safe place to live and access to health care in these difficult times. Shortening a defendant's sentence where there is no adequate release plan offers no benefit to the health of the inmate and in the process likely further endangers the community into which the defendant is release."). His plan, such as it is, should give the Court pause. On balance, defendant has not shown that he is entitled to early release based on these considerations.

## CONCLUSION

For these reasons, this Court should summarily deny defendant's motion for compassionate release.[8]

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney
New York State Bar
Registration Number 4444188

MARGARET J. CHRISS
Chief, Special Proceedings Division
D.C. BAR # 452-403

JOHN P. GIDEZ
Assistant United States Attorney
Deputy Chief, Special Proceedings Division
D.C. Bar # 332-908

*/s/ Amanda Williams*
AMANDA WILLIAMS
Assistant United States Attorney
Ohio Bar Number 0087052
Special Proceedings Division
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 809-2057
Amanda.williams3@usdoj.gov

---

[8] If a court grants a sentence reduction, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG § 5F1.2. *See* § 3583(e)(2).

We would note further that if the Court decides that a reduction is appropriate in this matter, the Court should fashion a sentence that requires defendant to undergo a 14 day quarantine period before BOP must release him.

CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that on October 13, 2020, I caused a copy of the foregoing to be served via the Court's Electronic Case Filing System and by email upon:

Justin Kingsolver and Dylan Burstein
Crowell & Moring LLP
1001 Pennsylvania Ave NW
Washington, DC 20004
JKingsolver@crowell.com
DBurstein@crowell.com

/s/ Amanda Williams
AMANDA WILLIAMS
Assistant United States Attorney